# EXHIBIT E

**VINCENT RIVERA - April 15, 2020**

```
                        NO. 2019-77361

DAVID COOK,                      )  IN THE DISTRICT COURT OF
                                 )
        Plaintiff                )
                                 )
VS.                              )  HARRIS COUNTY, TEXAS
                                 )
ROWAN COMPANIES, INC. A/k/a      )
ROWAN DRILLING and ROWAN         )
DRILLING (UK) LIMITED,           )
                                 )
        Defendants               )  113TH JUDICIAL DISTRICT


        **************************************************

            ORAL AND VIDEOTAPED DEPOSITION VIA ZOOM OF
                         VINCENT RIVERA
                         APRIL 15, 2020
                            VOLUME 1

        **************************************************
```

    ORAL AND VIDEOTAPED DEPOSITION OF VINCENT RIVERA, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on Wednesday, April 15, 2020, from 9:09 a.m. to 10:54 a.m., via Zoom before Sherry Hale, CSR in and for the State of Texas, reported by machine shorthand, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record herein.

VINCENT RIVERA - April 15, 2020

```
 1                A P P E A R A N C E S
 2
     FOR THE PLAINTIFF:
 3       Michael Patrick Doyle (via Zoom)
         Doyle, LLP
 4       3401 Allen Parkway, Suite 100
         Houston, Texas  77016
 5       Telephone: 713.571.1146
         Fax: 713.571.1148
 6       E-mail: Service@doylelawfirm.com

 7   FOR THE DEFENDANTS:
         Allen D. Hemphill (Via Zoom)
 8       Elizabeth Sandoval
         Brown Sims
 9       1177 West Loop South, Tenth Floor
         Houston, Texas  77027
10       E-mail: Esandoval@brownsims.com

11


12   Also Present:
         Harold Mullins, Videographer (via Zoom)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

VINCENT RIVERA - April 15, 2020

| | INDEX | |
|---|---|---|
| | | PAGE |
| | Appearances..................................... | 2 |
| | Stipulations................................... | 1 |
| | VINCENT RIVERA | |
| |     Examination by Mr. Doyle.................. | 5 |
| |     Examination by Mr. Hemphill............... | 70 |
| | Further Examination by Mr. Doyle.............. | 71 |
| | Signature and Changes......................... | 73 |
| | Reporter's Certificate........................ | 75 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| A | Plaintiff's First Amended Notice of Oral/ Videotaped and/or Videoconference Deposition Of Corporate Representative(s) of Defendant Rowan Companies, Inc. a/k/a Rowan Drilling And Rowan Drilling (UK) Limited | 5 |
| B | Injury/Illness Incident (Form 101) Printed at 17 May 2018 Bates Stamped ROWAN 00041-42 | 5 |
| C | Title 47. Maritime, Chapter 1 | 5 |
| D | Job Risk Assessment Policy/Procedure Bates Stamped ROWAN 00002-18 | 5 |
| E | Morning Report, Bates Stamped ROWAN 00066-67 | 5 |
| F | Rowan Drilling (UK) LTD. (Company) Purchase Order Bates Stamped ROWAN 00129-134 | 5 |
| G | Rowan Drilling, Rowan Gorilla VII (2 pages) | 5 |

```
 1    H    "Rowan Announces Contract with Chrysaor
           For the Rowan Gorilla VII"                     5
 2
      I    Classification Certificate
 3         Bates Stamped ROWAN 00050-52                   5

 4   J-1   DocuSign Envelope
           Bates Stamped ROWAN 00090-91                   5
 5
      J    Worldwide Master Service Agreement
 6         Bates Stamped ROWAN 00084-128                  5

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  What they would do is provide subject matter support.
2  So for clarity, when I speak about operation, I mean
3  the things that are actually occurring on the rig.  So
4  operations such as, you know, drilling or lifting or
5  things like that.  So they're more of an administrative
6  process.  They would support on the administrative side
7  of items.
8       Q.   So when you're talking about administrative
9  side of processes, those would include what, when
10 you're talking about the rig, wherever it happens to be
11 in the world?
12      A.   It would be things like reviewing procedures
13 that a certified rig mover would create or being
14 liaison for the OIM to the Marshall Islands just to
15 take that off his plate so he doesn't have to worry so
16 much -- to focus so much about that.  They don't -- you
17 know, an incident doesn't occur very often on a rig and
18 one that needs to be reported to the -- to the Marshall
19 Islands.  So it's just somebody to take that
20 administrative burden away from the OIM.  Ultimately,
21 it's the OIM's responsibility to do it.
22      Q.   When you talk about the OIM for the
23 Gorilla VII, April 2018, what does that mean?
24      A.   There is a person called the off -- the
25 offshore installation manager and --

1  Q.  And what --
2  A.  -- they are ultimately responsible for all
3  operations on the rig, and they have an OIM certificate
4  issued by the Marshall Islands, and so internationally,
5  they are the ones responsible for the rig.
6  Q.  The OIM for the Gorilla VII, April 2018, was
7  who?
8  A.  Andy Barker.
9  Q.  Mr. Barker is a citizen of what country?
10  A.  The UK.
11  Q.  Does Mr. Barker work with the rig wherever it
12  happens to be in the world?
13  A.  Sometimes.  Because the rigs could move to
14  different places, they would -- they -- there's a lot
15  of times we will put somebody on the rig who is local.
16  They are some traveling positions and that would be one
17  of them, but typically, the person on the rig is
18  somebody that lives locally.
19  Q.  The Gorilla VII is a rig that Rowan has had in
20  its fleet for a number of years before April 2018?
21  A.  Yes.  I believe 2001 was the -- was the -- was
22  the date that it started working.
23  Q.  And during those years before 2018 it had
24  worked at a number of locations around the world?
25  A.  Yes.

1  U.S.
2      Q.   The Gorilla VII was a Marshall Islands flagged
3  vessel?
4      A.   Yes.
5      Q.   And you have in front of you what's been
6  marked as Exhibit C, which is a maritime administration
7  standards for the Marshall Islands.  Have you seen that
8  document or anything similar before?
9      A.   Well, I looked at it here and I have been
10 through Marshall Islands regulations in the past, maybe
11 not specifically this -- the sections of the
12 regulations, so...
13     Q.   Can you confirm on behalf of both entities
14 today that as a Marshall Island flagged vessel, it's
15 required to comply with the general maritime law of the
16 United States of America?
17             MR. HEMPHILL:  Object to form.
18     A.   Can you point it out?  I'm sorry.
19     Q.   (BY MR. DOYLE)  Yes, sir.  Let me make it
20 bigger for you.
21     A.   I can see it.  That's good enough.
22             Yes, I can confirm that.
23     Q.   In terms of the manner in which the
24 regulations are enforced and practiced, both entities
25 you're testifying on behalf of today expect to measure

1  on board at the time of the injury we're here on, the
2  JSA process was supposed to follow policies and
3  procedures set forth, started in Houston and approved
4  in Houston?
5       A.   Yes.
6       Q.   Now -- I'm sorry.  Go ahead.
7       A.   Just for clarity on that -- on that question,
8  if we're speaking about that process, yes.  There are
9  actually rig-specific operating procedures that include
10 the actual job risk assessment for the work being done,
11 right?  So there's the procedure -- the procedure that
12 you saw there -- the procedure that you saw there is
13 describing a general process, but the rig must put that
14 into practice and make it specific for them, so what's
15 actually being carried out is what's -- they
16 specifically to create.
17      Q.   What you're telling us is, is that the way
18 those two entities operate, the Gorilla VII,
19 April 2018, was policies, procedures, for example, JSA
20 started, approved in Houston, but in practice, whoever
21 happened to be wherever the rig was, they had to carry
22 it out?
23      A.   Right.  Ultimately, the OIM has overall
24 authority to determine what is safe, so there's a --
25 there's a -- there's another procedure that describes

1  the OI -- specifically that, the OIM's authority and
2  authority for exception.  And what that's saying is
3  that the OIM, although he might be supported by other
4  functions like agency function to develop a procedure
5  that if it doesn't work for him on his rig, then he has
6  the authority to -- well, the authority for exception
7  and should not be doing anything that's unsafe based
8  on -- just because he's been supported on developing a
9  procedure.
10      Q.   I want to make sure that we're on the same
11 page then.  Looking at Exhibit D, this document
12 contains policies and procedures that are originated,
13 approved in Houston in practice for not only the
14 Gorilla VII, but all the rigs?
15      A.   Yes.  This procedure right here.
16      Q.   The JSA?
17      A.   Yes.
18      Q.   Or the job -- I said that wrong.  Job risk
19 assessment, JRA.
20      A.   JRA, yes.
21      Q.   In addition to having the standards,
22 procedures that are set forth by personnel in Houston,
23 whoever happens to be the OIM person in charge has the
24 authority to deviate from these standards set forth by
25 Houston personnel?

1    A.    That is -- that is correct.
2    Q.    As long as there's not an unsafe decision or
3 it somehow creates an unsafe condition?
4    A.    That's correct.  And that's the reason that he
5 would do it -- he or she would do that, you know.  So
6 the functions are -- that are located in Houston
7 are supporting essentially the OIM in developing a
8 management system that he can use.  But those support
9 functions in Houston, they can't really understand all
10 the details of what an OIM can -- you know, can or
11 should do, so we're giving them a framework.  And if
12 for some reason that it doesn't -- it doesn't work for
13 them, they can deviate.
14   Q.    The framework or management system for
15 operations on board the Gorilla VII, April 2018,
16 wherever it happened to be, are set forth by personnel
17 in Houston?
18   A.    Some.  Some.  So the -- there's some
19 procedures that are developed in Houston, some
20 procedures that are developed locally.
21   Q.    Which --
22   A.    And there's a swath of procedures that are
23 developed specifically on the rig.
24   Q.    Focusing just now on the job risk assessment
25 part of Exhibit D, that particular policy was

1    Q.   So --
2    A.   -- without -- to have things secured unless
3  you're on float.
4    Q.   Now, when you say "on float," what do you
5  mean?
6    A.   So the rig itself has -- it can be -- has
7  three legs that allow it to be elevated off the surface
8  of the water and -- but it's also designed to move to
9  another location.  And how that's done is those legs
10 are picked up.  The hull of the rig begins to float and
11 it's typically towed to the next location.  If it's
12 going a long distance, it may go on what's called the
13 heavy lift shift.  But either way, both of those,
14 either floating by its own hull or on a heavy lift
15 ship, it's -- there's still risk of the -- of the -- of
16 the rig itself listing (phonetic) left or right, and
17 anything that's unsecured on the deck or anywhere on
18 the rig would move as a result of that listing.  And so
19 when we're on float, not elevated, things are secured.
20   Q.   Was the -- was the rig on float at the time of
21 the injury, April 4, 2018?
22   A.   No.
23   Q.   How was it secured?
24   A.   How was the rig secured?
25   Q.   Yes, sir.

1  A.  It was elevated.  It had its legs on and it
2  was elevated out of the water.
3  Q.  How were the pipe stanchions when the rig is
4  what you call secure supposed to secure the piping
5  involved in this incident?
6  A.  Well, they -- when people -- when the -- when
7  the people operating the crane and laying the pipe,
8  they keep it within the stanchions and so as they're --
9  it doesn't roll off somewhere else, if that makes any
10 sense.  It's within the designated area to hold the
11 pipe.
12 Q.  The decision to hold the pre-work meeting at
13 the location on the rig where it occurred, were you
14 able to determine who made that decision?
15 A.  The -- well, I think one of the issues was --
16 so, no, not specifically.  What I do know is that it
17 was the -- the group that was in that area that decided
18 to be in that area.  So there's lots of area underneath
19 the cantilever.  One of those areas is the pipe
20 stanchion area, and that particular group decided to be
21 in that pipe stanchion area.
22 Q.  That particular group, did it include Rowan
23 personnel?
24 A.  No, it did not.
25 Q.  The decision whether a particular area is

```
 1  this.
 2      Q.   (BY MR. DOYLE)  In terms of the OIM
 3  supervision, who would the OIM April 2018 report to?
 4      A.   The OIM would report to the rig manager.
 5      Q.   Rig manager would be located where?
 6      A.   In Aberdeen.
 7      Q.   The rig manager, in turn, reports to in
 8  April 2018?
 9      A.   He reports to an operations manager.
10      Q.   Based?
11      A.   In Aberdeen.
12      Q.   And the operations manager, in turn, reports
13  to?
14      A.   A vice president.
15      Q.   Located in?
16      A.   Aberdeen.
17      Q.   And the vice president, in turn, reports to?
18      A.   The CEO.
19      Q.   Based in?
20      A.   At the time, he was based in Houston.
21      Q.   In terms of the management structure for the
22  Gorilla VII in April 2018, you have a chain of command
23  from the OIM all the way up to the CEO in Houston?
24      A.   Uh-huh.  Yes.
25      Q.   In that process where the chain of command for
```

1  and, yes, Mr. Cook, yes.  So you interview people
2  and some people might lead to others and so there might
3  have been somebody else that witnessed it or was a part
4  of it, but we didn't get any information from him.
5      Q.   Were there personnel in Houston involved in
6  overseeing the investigation?
7      A.   No.  That's done locally.
8      Q.   Is there an HSE function that's performed and
9  used in April 2018?
10     A.   There is an HSE function, but it's not that
11 function.
12     Q.   What is the HSE function, Help Save the
13 Environment, that was performed in Houston in 2018?
14          MR. HEMPHILL:  Again, I think that's
15 question -- what is it?  10 -- no.  It's 9.  Employees
16 located in Texas, making decisions related to the
17 incident in question.  I'm okay if he answers it, but
18 it's -- I don't think it's on the rep question.
19          MR. DOYLE:  Let me -- let me make it even
20 more clear.
21     Q.   (BY MR. DOYLE)  In terms of the
22 "documation" -- policies and procedures for the
23 investigation on the rig in April 2018, those are set
24 forth under an HSE function carried out where?
25     A.   In -- I want to make sure I'm answering your

1  sign?  And if you need additional time, that's
2  perfectly okay with me.
3              MR. HEMPHILL:  Let me ask just a -- just a
4  couple of questions.
5              MR. DOYLE:  Oh, I'm sorry.  I assumed I
6  was done.  We're good.  Go ahead.
7              MR. HEMPHILL:  I mean, it's a pretty good
8  assumption.  I have maybe just two questions.
9              (The time is 10:52 a.m.)
10                     EXAMINATION
11  BY MR. HEMPHILL:
12     Q.   And it's only because I'm not sure if this is
13  clear in the prior testimony.
14              Mr. Rivera, how long has the Gorilla VII
15  been working in the North Sea?
16     A.   It's been in the North Sea since 2011.
17     Q.   In that period since 2011, how do the crew
18  members get to the Gorilla VII?
19     A.   They leave from a helicopter in -- at the
20  helicopter heliport in Aberdeen.  Of course, in this
21  case, they would drive to Dundee.
22     Q.   So if they were working or if they were out
23  drilling in the North Sea, they'd take a helicopter
24  from Aberdeen to the --
25     A.   From Aberdeen, yes, sir.

1  Q.  And if it happens to be in port, like it was
2  in Dundee, then that's a drive, right?
3  A.  That's a drive, yes.
4  Q.  Has it -- has it worked anywhere else since
5  2011, anywhere other than the North Sea?
6  A.  Don't know.
7       MR. HEMPHILL:  Okay.  I have no further
8  questions.
9       (The time is 10:53 a.m.)
10      FURTHER EXAMINATION
11 BY MR. DOYLE:
12 Q.  Can you give us an estimate how long it was
13 doing refitting in Dundee by the time of April 2018
14 this occurred?
15 A.  I think it may be about a month and a half,
16 maybe two months by this time, and then I think the
17 project completed in May.
18 Q.  And I forgot to ask this.
19      What's your current mailing address where
20 you are located now?  Not physically, but your business
21 address, so to speak.
22 A.  Now, you're asking me -- let me -- let me --
23 it's the office here in Aberdeen.
24 Q.  There's a Rowan office in Aberdeen.  That's
25 where you're based --

```
 1                       NO. 2019-77361

 2   DAVID COOK,                ) IN THE DISTRICT COURT OF
                                )
 3           Plaintiff          )
                                )
 4   VS.                        ) HARRIS COUNTY, TEXAS
                                )
 5   ROWAN COMPANIES, INC.      )
     A/k/a ROWAN DRILLING and   )
 6   ROWAN DRILLING (UK)        )
     LIMITED,                   )
 7                              )
             Defendants         ) 113TH JUDICIAL DISTRICT
 8
                     REPORTER'S CERTIFICATION
 9      TO THE ORAL AND VIDEOTAPED DEPOSITION VIA ZOOM OF
                          VINCENT RIVERA
10                        APRIL 15, 2020

11        I, Sherry Hale, Certified Shorthand Reporter in and
     for the State of Texas, hereby certify to the
12   following:
          That the witness, VINCENT RIVERA, was duly sworn by
13   the officer and that the transcript of the oral
     deposition is a true record of the testimony given by
14   the witness;
          That the deposition transcript was submitted on
15   April 23, 2020 to the witness or to the attorney for
     the witness for examination, signature and return to
16   Miller Reporting.com by May 14, 2020.
          That the amount of time used by each party at the
17   deposition is as follows:

18        Michael Patrick Doyle - ^ HRS:MIN
          Allen D. Hemphill - ^ HRS:MIN
19
          That pursuant to information given to the
20   deposition officer at the time said testimony was
     taken, the following includes counsel for all parties
21   of record:

22        Michael Patrick Doyle - ATTORNEY FOR PLAINTIFF
          Allen D. Hemphill - ATTORNEY FOR DEFENDANTS
23        Elizabeth Sandoval  - ATTORNEY FOR DEFENDANTS

24

25
```

VINCENT RIVERA - April 15, 2020

1  　　　I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
2  action in which this proceeding was taken, and further
that I am not financially or otherwise interested in
3  the outcome of the action.

4

　　　Further certification requirements pursuant to Rule
5  203 of TRCP will be certified to after they have
occurred.

6

7

8
　　　Certified to by me this 23rd day of
9  April, 2020.

10

11

12

13  *[signature: Sherry M. Hale]*

14  _____
　　SHERRY M. HALE, CSR
15  　　Certified Shorthand Reporter
　　In and for the State of Texas
16  　　Certificate No. 6215
　　Expiration Date: 04/30/21
17  　　Firm Registration No. 62
　　1225 North Loop West, Suite 327
18  　　Houston, Texas 77008
　　(713) 581-7799 - Office
19  　　(713) 626-1966 - Fax

20

21

22

23

24

25

VINCENT RIVERA  -  April 15, 2020

```
 1         FURTHER CERTIFICATION UNDER RULE 203 TRCP

 2
        The original deposition was/was not returned to the
 3   deposition officer on _____N/A_____;

 4      If returned, the attached Changes and Signature
     page contains any changes and the reasons therefor;
 5
        If returned, the original deposition was delivered
 6   to Michael Patrick Doyle, TBA # 06095650, Custodial
     Attorney;
 7
        That $ ____712.60_____ is the deposition officer's
 8   charges to Plaintiff for preparing the original
     deposition transcript and any copies of exhibits;
 9
        That the deposition was delivered in accordance
10   with Rule 203.3 and that a copy of this certificate was
     served on all parties shown herein and filed with the
11   Clerk.

12      Certified to by me this __14th_ day of

13   _____May_____, 2020.

14

15
                    [signature: Sherry M. Hale]
16

17   _____
     SHERRY M. HALE, CSR
18   Certified Shorthand Reporter
     In and for the State of Texas
19   Certificate No. 6215
     Expiration Date:  04/30/21
20   Firm Registration No. 62
     1225 North Loop West, Suite 327
21   Houston, Texas 77008
     (713) 581-7799 - Office
22   (713) 626-1966 - Fax

23

24

25
```